# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | | |
|---|---|---|
| RALPH D. WHITE, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 7:20-cv-00420 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| DR. KYLE SMITH, *et al.*, | ) | By:   Hon. Thomas T. Cullen |
| | ) | United States District Judge |
| Defendants. | ) | |

Ralph D. White, a Virginia inmate proceeding *pro se*, filed this civil action under 42 U.S.C. § 1983 against five defendants, all of whom are identified as physicians or nurses at prison facilities where White was incarcerated, including Augusta Correctional Center ("ACC").[1] White alleges that Defendants violated his Eighth Amendment rights by failing to ensure that he received adequate and timely medical care for a lesion on his right foot. Primarily, White alleges that he was scheduled for surgery prior to his arrival at ACC to excise the legion, but was transferred before it occurred. For various reasons, he did not undergo surgery until almost two years later. White further alleges that the surgeon had recommended antibiotics for five days following the surgery, but one of the defendants, Dr. Kyle Smith, instead prescribed him only one dose of the antibiotic. Thereafter, White suffered a painful infection that had to be treated with additional antibiotics.

Three defendants have been served and have filed either a motion for summary judgment

---

[1] One defendant was dismissed, and the remaining defendants are: Dr. Kyle Smith; Nurse D. Dameron; Nurse A. Phyl; and Dr. Ericka S. Young (collectively "Defendants").

(Dr. Smith and Nurse D. Dameron) or a motion to dismiss (Dr. Ericka S. Young).[2] This matter is before the court on the two motions for summary judgment, which have been fully briefed and are ripe for disposition.[3] For the reasons explained below, the court will grant the motions.

White has not filed his own motion for summary judgment, but his opposition memorandum states that it is being offered in support of summary judgment in his favor. Based on the opposition, it appears that he is simply noting that the court could *sua sponte* grant summary judgment in his favor. (Opp'n pg. 3 [ECF No. 33] (citing Fed. R. Civ. P. 56(f)).) Thus, the court does not treat White's opposition as a separate summary judgment motion.[4]

## I.   FACTUAL BACKGROUND[5]

The facts recited below are either undisputed or presented in the light most favorable to White, the nonmoving party on summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S.

---

[2] Neither of the other two defendants have been served. The claims against one—Dr. Vishakantaiah—have been dismissed without prejudice as a result. (*See* Order, Nov. 23, 2021 [ECF No. 49].) The court is awaiting an address from Plaintiff as to the other, Nurse A. Phyl.

[3] Dr. Young's motion to dismiss will be addressed by a separate opinion and order.

[4] Even if White had moved for summary judgment, his motion would require the court to view the evidence in the light most favorable to Defendants. So viewed, any summary judgment motion by White would be denied for the same reasons that Defendants' motions must be granted: White has not presented facts from which a reasonable jury could find in his favor.

[5] The summary judgment record consists of affidavits from Dr. Smith and Nurse Dameron and includes medical records attached to both affidavits and the initial complaint (which White authenticated in an affidavit). White's complaint is signed, but it is not sworn or otherwise verified. The court therefore cannot consider his unsworn factual allegations as part of the summary judgment record. *Goodman v. Diggs*, 986 F.3d 493, 498 (4th Cir. 2021) (explaining that a *verified* complaint is the equivalent of an opposing affidavit for summary judgment purposes when the allegations are based on personal knowledge, but an unverified complaint is not); *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991) ("[W]hen one party files a motion for summary judgment, the non-movant cannot merely rely on matters pleaded in the complaint, but must, by factual affidavit or the like, respond to the motion."). There is an affidavit attached to White's complaint, which the court considers and treats as summary judgment evidence, but it primarily authenticates the attached medical records and contains only limited relevant factual allegations.

242, 255 (1986).[6]

Dr. Smith, a licensed physician who is Board Certified in family medicine, worked at ACC as an independent contractor and treated White. (Aff. of Kyle Smith, M.D. ¶ 2, Oct. 29, 2020 [ECF No. 24-1].) Nurse Derinda Dameron, RN, is a registered nurse and Health Services Administrator ("HSA"). She works with the Virginia Department of Corrections as an independent contractor to provide nursing care and administrative services to ACC inmates. In that role, Dameron coordinates medical services provided by the physicians and nurses, reviews and responds to inmate grievances, and handles myriad patient-care issues. (Aff. of Derinda Dameron, RN, HSA ¶ 2, Nov. 12, 2020 [ECF No. 28-1].)

While White was an inmate at the Rappahannock Regional Jail ("RRJ"), he received treatment for his right foot. On January 31, 2018, medical staff at that facility assessed him as having a "[h]yperpigmented lesion on dorsum of right foot" and referred him to an outside podiatrist for assessment. (Med. R. at 7 [ECF No. 1-3].) He ultimately was scheduled for foot surgery on May 14, 2018, but on or about April 24 (approximately three weeks before his scheduled surgery), he was transferred from RRJ to Nottoway Correctional Center. (*Id.* at 3 (transfer record from RRJ to Nottoway).) The medical transfer sheet from RRJ—which appears to be a one-page form intended to allow the transferor facility to convey important medical information about a prisoner to the prisoner's new facility—states that White had three pending

---

[6] In his opposition, White argues that because defendants Dameron and Smith filed a motion for summary judgment but failed to file an answer or other responsive pleading, the allegations in the answer must be deemed admitted. (Opp'n pg. 3 [ECF No. 33] (citing Fed. R. Civ. P. 8(b)(6)). Rule 8(b)(6) is inapplicable here, however. "[U]nlike the typical civil case, defendants do not have to respond to a complaint covered by the [Prison Litigation Reform Act] until required to do so by the court, and waiving the right to reply does not constitute an admission of the allegations in the complaint." *Jones v. Bock*, 549 U.S. 199, 213–14 (2007) (citing 42 U.S.C. §§ 1997e(g)(1), (2)). The court has not directed defendants to file an answer and their failure to do so does not constitute an admission of the complaint's allegations. *See id.*

appointments with outside providers scheduled for May, including the May 14, 2018 surgery. (*Id.* at 3.)

While White was incarcerated at Nottoway (a total period of about six weeks), medical staff evaluated him on May 7, 2018, referring to the spot on his right foot as "necrotic[-] appearing tissue." (*Id.* at 10.) The same note, which appears to be by Nurse A. Phyl, states that the area "looks necrotic but offender said it has looked this way for years." (*Id.*) The nurse referred him to a physician, who prescribed Tylenol. (*Id.*) Ultimately, the Nottoway medical staff directed that the issue could be addressed at White's "final destination." (*Id.*)

On June 5, 2018, White was transferred from Nottoway to ACC. The medical transfer sheet, which was completed by providers at Nottoway prior to White's transfer to ACC, does not indicate anything about the lesion, problems with his right foot, or the previously scheduled surgery. (Med. R., ECF No. 24-2, at 123.) Instead, both the sections titled "Current Medical Problems Requiring Attention" and "Pending Appointments, Prosthesis on order, etc." are blank. (*Id.*; *see also* Smith Aff. ¶ 5; Dameron Aff. ¶ 6.)

Upon White's arrival at ACC, Dameron completed his intake screening, noting that White reported lower back and shoulder pain and degenerative disc disease. The intake form that she completed did not mention any issues with White's foot—complaints or otherwise. According to White's affidavit, though, he complained to Dameron about the lesion on his right foot and associated pain, just as he had at Nottoway and RRJ. (Aff. of Ralph White ¶ 7, June 26, 2020 [ECF No. 1-2].)

Dameron disputes this, claiming that White did not mention any issue with his right foot

or mention any previously scheduled surgery.[7] (Dameron Aff. ¶ 5.) Dameron contends that if White had mentioned the lesion on his foot or pain or discomfort of any kind, she would have "examined his foot in detail, and . . . documented both his complaint and her assessment in the record." (*Id.*) Dameron avers that, in the absence of any complaint by White and because the medical transfer sheet from Nottoway to ACC contained no information about these issues, she did not record anything, nor did she see any need to review the earlier transfer sheet from White's transfer from RRJ to Nottoway.

Dameron further explains that her role in performing the intake screening is fairly limited. She explains: "The physician reviews all intake screenings and prior records for inmates who were transferred from other facilities. It would have been the physician's decision to follow up on any previously scheduled surgery and determine whether it was still necessary and, if it was, how and when to re-schedule it." (*Id.* ¶ 7.) White's records reflect that Nagaraja Vishakantaiah, M.D., signed off on the intake screening on June 11, 2018. Dameron does not know whether Dr. Vishakantaiah—"whose ultimate decision it was to determine whether Mr. White merited further treatment—reviewed the medical transfer sheet from [RRJ] to Nottoway, or any other prior records." (*Id.*)

Dr. Smith began working at ACC in early July 2018, about a month after White arrived there. Dr. Smith's affidavit states that he "saw Mr. White for the first time on May 13, 2019." (Smith Aff. ¶ 9.) Presumably Dr. Smith means that May 2019 was the first time he saw White *for the foot lesion*, as the medical records reflect that Dr. Smith treated White on at least one earlier

---

[7] For the reasons explained *infra* when analyzing White's claims, this dispute does not preclude entry of summary judgment in Dameron's favor.

occasion for other conditions. (*See, e.g.*, ECF No. 24-2, at 56 (August 6, 2018 note in chart that Smith saw White for complaints of right shoulder pain and prescribed him medications, including Tylenol); *id.* at 53 (Smith's signature on an order for low-dose aspirin for White, dated December 18, 2018).)

In any event, between his arrival in June 2018 and April 2019, the records reflect that White was seen by medical personnel on at least 10 separate occasions for "minor issues such as upper respiratory infections and lower back and shoulder pain." (Smith Aff. ¶ 6.) At each encounter with medical staff, White denied any other systemic complaints. (*Id.*) He did not mention a lesion on his foot at any time during that period. (*Id.*)

The first record of White mentioning a problem with his right foot while at ACC occurred on April 3, 2019, approximately 10 months after his arrival. On that date, he was evaluated by a nurse for complaints of a chronic lesion on his right foot. (Smith Aff. ¶ 7.) The nurse described the lesion as "eraser sized" and "tender to touch, but fluid in nature." (*Id.*; *see also* ECF No. 24-2, at 51.) White stated that it had been removed once and returned. He also told the nurse that he was supposed to have this spot removed at a previous facility but was transferred prior to the procedure. (Smith Aff. ¶ 7.) The nurse referred him to Dr. Smith, labeling the referral "routine" as opposed to "emergent," and also directed him to return if his condition worsened. (ECF No. 24-2, at 51.) The records are not entirely clear on the point, but it appears that he was scheduled to see a physician on April 16, 2019.

On that date, White was seen by Dr. Mann. (Smith Aff. ¶ 8.) The records reflect that White told Dr. Mann the lesion had been present on his foot since childhood and he related it to a toad urinating on his foot. (*Id.*; *see also* ECF No. 24-2, at 50.) Dr. Mann noted it was mildly

tender and had a round, black spot over a soft, cystic mass. She diagnosed it as a cyst with blue nevus (a benign mole) and indicated that it should be scheduled for surgical removal as an elective procedure. A notation in White's medical records from the same date appears to indicate that the surgery was scheduled on the elective surgery list by a "V. Hall." (ECF No. 24-2, at 51.)

The first time that Dr. Smith saw White for the foot lesion was about a month later, on May 13, 2019.[8] On that date, White reiterated that the growth had been present since he played with toads as a child. He complained it was growing and becoming more painful. Dr. Smith assessed the growth and measured it at 1.2 centimeters by 1.2 centimeters, over a palpable cyst. Based on his education, training, and experience, Dr. Smith assessed the blue nevus as benign, without evidence of alarming features. At White's request, Dr. Smith placed White on the list for an elective excision of the blue nevus. (*Id.*) Again, a notation indicates that he was added to that list by "V. Hall." For whatever reason—and although it was noted in White's medical record— Dr. Smith states that he did not know that Dr. Mann previously had placed White on the elective procedure list.[9] (Smith Aff. ¶ 8.) He also acknowledges that the elective procedure list was "very long," but he does not specify what is a typical wait time for such a procedure nor explain how regularly elective procedures are performed. (*Id.*)

Over the next eight months, White was seen and treated for minor issues such as dental pain, sore throat, and chronic back and shoulder pain. (*Id.* ¶ 10.) He did not complain again about

---

[8] During the same encounter, White complained of gastrointestinal issues, and Dr. Smith ordered lab work to rule out colitis. (Smith Aff. ¶ 9.)

[9] No party explains how care is coordinated among the medical providers at ACC, nor does any party explain how the medical records are kept, although White has provided his own testimony and documentation from prison officials confirming that his records from RRJ and Nottoway were received upon his arrival at ACC. (White Aff. ¶¶ 4–6 & Exs 1 & 2 [ECF No. 1-3, at 1–2.] In any event, the court presumes that each treatment provider at least has easy access to the inmate's medical records from prior visits at the same institution.

his foot until January 22, 2020. On that date, during a visit with nursing due to nasal congestion, White complained that his foot was becoming more painful, and he was referred by the nurse for an appointment with Dr. Smith. (*Id.* ¶ 11.)

On February 10, 2020, Dr. Smith was away from the facility, so Dr. Cutchin examined White and ordered excision of the blue nevus. (ECF No. 24-2, at 39.) Dr. Smith avers that, "[f]or reasons unknown to [him]," he was not informed of Dr. Cutchin's order and did not know that excision had been ordered. (Smith Aff. ¶ 12.)

Dr. Smith next saw White during a sick-call appointment on March 11, 2020. His examination revealed a change in the lesion, including a palpable mass that had not previously been present. Because of these changes, Dr. Smith scheduled an excision for White to occur the following week. (*Id.* ¶ 13.)

On March 18, 2020, Dr. Smith performed a wide excision, excising the mole and underlying lesion and suturing the area.[10] He sent the tissue to pathology for testing. He also prescribed ibuprofen for pain along with daily dressing changes for three days. Per Dr. Smith's instructions, White was seen by nursing for the next three days, and the area remained clear with no signs of infection. (*Id.* ¶ 15.)

On March 26, 2020, Dr. Smith removed the sutures without complication. During the visit, Dr. Smith informed White that he had a *preliminary* diagnosis of malignant melanoma, and that Dr. Smith would refer White to an outside dermatologist. (ECF No. 24-2, at 34; Smith Aff.

---

[10] White alleges that Dr. Smith was "unqualified" to perform the excision (Opp'n pg. 33), which he describes as a "dermatological surgery," but he offers no competent evidence to support that statement. To the extent he is attempting to assert any state-law claims against Dr. Smith, the court will decline to exercise jurisdiction over any such claims.

¶¶ 17, 19.) On April 20, 2020, though, Dr. Smith saw White and informed him the final pathology diagnosis from the tissue he had excised was "cellular blue nevus with atypical features, extend[ing] to peripheral margins." (Smith Aff. ¶ 18.) Dr. Smith's note from that date appears to state that the "pathology report had *not* show[n] melanoma." (ECF No. 24-2, at 34 (emphasis in original).)

On April 21, 2020, consistent with Dr. Smith's referral, White was taken to an outside dermatologist, Dr. Kristen Savola, who performed a second excision to remove an additional half-centimeter from all sides of the lesion and check the margins for malignant cells. (Smith Aff. ¶ 19.) The procedure was uneventful and White was discharged back to the facility, although without paperwork to indicate any follow-up appointments or medications. (*Id.*) Dr. Savola's report and recommendation indicated "Z-Pack 5 day" as a postoperative medication (ECF No. 24-2, at 114), but that report was not sent until very late on April 23, 2020, several days after the surgery. Because it was "common practice to administer a single, prophylactic dose of an antibiotic post-operatively," though, Dr. Smith ordered one dose of azithromycin—an antibiotic—for White on the day of his surgery. (Smith Aff. ¶ 20.) He also instructed White to remove the dressing the following day and leave the wound open to air after applying Vaseline to it. (*Id.*; ECF No. 24-2, at 33.)

On April 22, the day after the surgery, White put in a sick-call request, claiming he was experiencing severe right foot pain that interfered with his sleep. He requested a walking cane and inquired into the status of antibiotics. (Smith Aff. ¶ 21.) On April 23, Dr. Smith performed a wound check on White. He reported his pain was steadily decreasing and he was in no acute distress. *Id.* The incision was clean and dry without signs of infection. He was issued a cane for

walking and prescribed 800 mg ibuprofen three times daily as needed for pain. (*Id.* ¶ 22; ECF No. 24-2, at 31–33.)

On April 26, White submitted an emergency grievance, indicating his right foot was swollen, painful, and red around the stitches. Nursing examined him and contacted Dr. Smith via telephone. In response, Dr. Smith provided a verbal order for clindamycin, another antibiotic. Dr. Smith examined White on April 28, at which time he was limping and continued to describe the area as very painful. The incision remained intact. Dr. Smith increased the dose of clindamycin and encouraged White's use of ibuprofen. Dr. Smith also issued a cast shoe for comfort and support. (Smith Aff. ¶ 23; ECF No. 24-2, at 31–32, 50.)

On April 29, because the infection was not responding to clindamycin, Dr. Smith changed White's prescription from clindamycin to Bactrim DS, a brand name for a medication containing two antibiotics—sulfamethoxazole and trimethoprim. Dr. Smith explained to White that if the area did not show improvement, a video conference would be arranged with Dr. Savola to determine the need for re-excision. (Smith Aff. ¶ 24; ECF No. 24-2, at 30–31.)

Dr. Smith saw White again on April 30 and May 4 to monitor the status of his healing. Fortunately, the infection responded quickly and thoroughly to the new antibiotic and resolved shortly thereafter. Dr. Smith removed the sutures without difficulty on May 5, at which time White was walking without difficulty and feeling better. Dr. Smith saw him again on May 7, and he was doing well enough that he did not need a follow up appointment. (Smith Aff. ¶ 25; ECF No. 24-2, at 29–30.)

Because he had not received the final pathology results from Dr. Savola, Dr. Smith emailed her inquiring into the status of these results on July 21, 2020, and July 28, 2020. On

August 4, 2020, Dr. Savola called Dr. Smith and relayed that the final diagnosis of White's skin lesion was non-cancerous cellular blue nevus. It was not malignant melanoma as the initial pathology report had revealed. Dr. Smith discussed follow-up care with Dr. Savola, who instructed White to return in three or four months. (Smith Aff. ¶ 26; *see also* ECF No. 24-2 at 5, 6, 8.)

Dr. Smith "happened to see" White shortly after Dr. Smith received the pathology results on August 4, and informed White of the non-cancerous diagnosis and treatment plan. White expressed understanding. (Smith Aff. ¶ 27.) In his opposition, White continues to dispute that characterization and claims that Dr. Smith is only belatedly claiming that the lesion was not a malignant melanoma (Opp'n pg. 13), but he does not provide any competent evidence to dispute Dr. Smith's medical testimony that the *final* diagnosis was not malignant melanoma.

## II.   PROCEDURAL HISTORY

In his complaint, White claims that Defendants violated his rights under the Eighth Amendment by being deliberately indifferent to his serious medical needs. (*See generally* Compl. [ECF No. 1].) White alleges that Dr. Smith and Nurse Dameron violated his rights by failing to ascertain information about his right foot from White's pre-ACC medical records. With regard to Dameron, White also alleges that she violated his rights by failing to ensure he received quality, adequate healthcare in a timely fashion. (Compl. ¶ 52.) As to Dr. Smith, White also alleges that he violated his rights by failing to refer him to a specialist for surgery in a timely manner and for allegedly denying White the 5-day course of antibiotics that Dr. Savola had recommended following White's April 21, 2020 surgery.

As noted, Dameron and Smith have moved for summary judgment. Both deny that they

disregarded any of White's conditions, were deliberately indifferent to any of his medical needs, or intentionally or improperly delayed his treatment. The motions have been fully briefed and are ripe for disposition.

### III.   STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure, the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson*, 477 U.S. at 248–49).

When ruling on a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam). To withstand a summary judgment motion, the nonmoving party must produce sufficient evidence from which a reasonable jury could return a verdict in his favor. *Anderson*, 477 U.S. at 248. "Conclusory or speculative allegations do not suffice, nor does a mere scintilla of evidence in support of the nonmoving party's case." *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002) (cleaned up).

### IV.   ANALYSIS

"Section 1983 authorizes a plaintiff to sue for an alleged deprivation of a federal constitutional right by an official acting under color of state law." *Williamson v. Stirling*, 912 F.3d 154, 171 (4th Cir. 2018) (internal quotation marks and citations omitted). In order for an official

to be held liable under § 1983, the plaintiff must affirmatively show that the official "acted personally in the deprivation of the plaintiff's rights." *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985) (internal quotation marks and citation omitted). "That is, the official's 'own individual actions' must have 'violated the Constitution.'" *Williamson*, 912 F.3d at 171 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)).

White claims that Nurse Dameron and Dr. Smith violated the Eighth Amendment's prohibition of cruel and unusual punishment. "Under the Eighth Amendment, [convicted] prisoners have the right to receive adequate medical care while incarcerated." *DePaola v. Clarke*, 884 F.3d 481, 486 (4th Cir. 2018). An Eighth Amendment violation occurs when a correctional official "demonstrates 'deliberate indifference' to an inmate's serious medical needs." *Id.* (citations omitted).

A claim of deliberate indifference has two components. *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). "The plaintiff must show that he had serious medical needs, which is an objective inquiry, and that the defendant acted with deliberate indifference to those needs, which is a subjective inquiry." *Heyer v. United States Bureau of Prisons*, 849 F.3d 202, 209 (4th Cir. 2017). "An official is deliberately indifferent to an inmate's serious medical needs only when he or she subjectively 'knows of and disregards an excessive risk to inmate health or safety.'" *Jackson*, 775 F.3d at 178 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). This is an "exacting standard," which requires more than "mere negligence or even civil recklessness." *Id.* (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). To establish a constitutional violation, "it is not enough that an official *should* have known of a risk" to an inmate's health. *Id.* Rather, the official "must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed

by the official's action or inaction." *Id.*

To constitute deliberate indifference, the treatment "must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990), *overruled in part on other grounds by Farmer*, 511 U.S. at 837. "The subjective component therefore sets a particularly high bar to recovery." *Iko*, 535 F.3d 225, 241 (4th Cir. 2008).

In this case, Nurse Dameron and Dr. Smith do not appear to dispute that the growth on White's foot, for which he was referred to an outside surgeon, was a serious medical need at some point in time. *See Iko*, 535 F.3d at 241 (explaining that a serious medical need includes "one that has been diagnosed by a physician as mandating treatment" (internal quotation marks and citation omitted)). They focus more on assertions that the record does not contain sufficient evidence from which a reasonable jury could find that they acted with deliberate indifference to a serious medical need.

The record certainly reflects failures of communication among his various medical providers, and the lengthy delays in obtaining a surgical excision (at least while it was classified as "elective") are far from ideal. But upon careful review of the entire record and relevant case law, the court concludes that the record is insufficient to allow a jury to find that an Eighth Amendment violation occurred. Thus, the court will grant summary judgment for both defendants.

Turning first to the claim against Dameron, it is worth noting that, after performing White's intake screening at ACC, she had no personal interactions with him. (Dameron Aff. ¶¶ 8, 12.) Accordingly, White's complaints about his subsequent treatment while at ACC are not

properly directed toward Dameron. Instead, the question before the court is whether Dameron exhibited deliberate indifference in: (1) completing the intake questionnaire and, in particular, when she failed to review records from Nottoway and RJJ, other than the transfer form from Nottoway; and (2) not examining White or recording anything about the lesion on White's right foot in his intake paperwork after he reported it to her.

White has offered sworn testimony that he informed Dameron about his foot lesion or the missed surgery during the intake interview. White's testimony is contradicted by the medical sheet that Dameron completed, and White has presented no reason why Dameron would intentionally fail to examine him, note the information about his foot, or refer him to a physician if he had informed her about pain in his foot or his postponed surgery.[11] Put differently, nothing in the record suggests that any failure by Dameron related to his foot was intentional or done with an intent to cause White harm.

But for purposes of summary judgment, the court must credit White's account of the intake interview. Even so, he has not offered sufficient evidence from which a jury could find that Dameron was deliberately indifferent. She may well have been negligent in failing to examine his foot or record his complaint, or negligent in failing to review the RRJ records and relying instead on the Nottoway records. But such failures, on a single occasion, do not amount to deliberate indifference to a serious medical need. *See Overman v. Wang*, 801 F. App'x 109, 112 (4th Cir. Feb. 27, 2020) (affirming district court's ruling in defendant's favor after a bench trial and explaining that a physician's failure to keep correct records does not translate into deliberate

---

[11] White also presents no evidence that Dameron had any ability to have his surgery scheduled—and Dameron denies that she could schedule a surgery without physician approval.

indifference unless there is also evidence that "the physician subjectively comprehended and intentionally disregarded the existence of facts indicating more significant injury"); *Douglas v. McCarty*, 87 F. App'x 299, 301 (4th Cir. 2003) (affirming dismissal of Eighth Amendment claim against nurse where plaintiff alleged that nurse failed to accurately record his medical condition following an altercation and exhibited a hostile attitude toward him). Even if Dameron knew White's foot was hurting and that a surgeon had previously scheduled him for (apparently elective) surgery, those facts do not reflect that she had knowledge of a "excessive risk" of serious or significant physical injury from failing to do anything at the time of his intake, *Jackson*, 775 F.3d at 178, or that her conduct was so "grossly incompetent" as to equate to deliberate indifference, *Miltier*, 896 F.2d at 851. At most, they reflect that she ignored a single complaint of pain.

Indeed, the undisputed evidence shows that White did not make any medical complaint concerning his foot again until April 2019, approximately 10 months after he supposedly told Dameron about it. That is true despite seeing medical providers at ACC on numerous occasions during that time span for a host of complaints. (ECF No. 24-2 at 54–62.) This undermines his constitutional claim. *See Shover v. Chestnut*, 798 F. App'x 760, 763 (4th Cir. 2020) (affirming grant of summary judgment in favor of medical administrator where she failed to provide pretrial detainee with orders for a cane and a lower tier bunk; and reasoning that even if she had reviewed his intake form showing that he reported he had used a cane in the past, he had failed to request either a cane or a lower bunk in subsequent appointments).

Even when White finally complained and was examined by physicians, both Dr. Mann and Dr. Smith independently determined that it was not medically necessary that the cyst be

removed, but instead determined that its removal was an elective procedure. This fact supports the conclusion that there was not a serious risk of substantial injury from Dameron's doing nothing to treat him upon intake. On this record, Dameron's actions, without more, do not constitute deliberate indifference. *See Boblett v. Angelone*, 957 F. Supp. 808, 814 (W.D. Va. 1997) (explaining that where a prisoner made a single complaint of pain, but then failed to advise the medical staff of any increased pain or mishap resulting in additional pain, the medical staff were not deliberately indifferent in failing to refer him to a physician); *see also id.* at 813 ("[T]he failure to provide a knee brace upon a single recommendation by a physician, in the absence of any subsequent requests whatsoever by plaintiff, does not demonstrate deliberate indifference.").

The court further notes that the very first time that White's complaint about his foot appears in his ACC medical records (in April 2019), he was referred to a physician, examined, and placed on the elective surgery list. Although this prompt treatment was not attributable to Dameron, it indicates that he did receive care in response to his complaints at ACC. If, in fact, he was in pain for his first 10 months at ACC, he had an obligation to raise the issue again after intake. And given his numerous medical appointments during those 10 months, he had ample opportunities to do so.

Aside from Dameron's alleged failure to document White's foot lesion or postponed surgery on intake, White does not identify any other instance in which Dameron deprived him of attention or treatment or failed to respond to any complaint related to his medical treatment. Dameron is thus entitled to summary judgment as to the Eighth Amendment claims against her.

As to Dr. Smith, the court addresses first White's allegation that Dr. Smith violated his Eighth Amendment rights by failing to review White's medical records from other facilities.

Similar to the court's analysis in addressing the claim against Dameron, the court cannot conclude that Dr. Smith was "deliberately indifferent" for failing to review all of White's prior records and take some unspecified action, especially in light of White's own failure to raise the issue of the lesion for 10 months after his arrival, despite multiple medical appointments. An inmate cannot stay silent for months while a medical problem festers, and then claim that his current physicians should have known about the issue based on records from an earlier facility. Even if Dr. Smith was negligent in not reviewing those records, White has provided no evidence that Dr. Smith was aware of his lesion prior to May 2019, when he first examined White for it. Because deliberate indifference requires a defendant's *actual* awareness of a serious medical need, *Jackson*, 775 F.3d at 178, White's failure to show any such awareness by Dr. Smith is fatal to any claim based on conduct prior to May 2019.

Similarly, White's claim that Dr. Smith acted with deliberate indifference in failing to provide timely and adequate treatment is belied by the record. In May 2019, when Dr. Smith first saw White for the lesion, Dr. Smith's medical judgment, based on his own objective findings, was that the lesion posed no long-term risk to White. Dr. Mann, who had examined White the month before, also concluded that White should be on the elective excision list. Courts have repeatedly held that a lengthy wait time for prisoners to receive such elective procedures, without more, do not give rise to an Eighth Amendment claim. *See, e.g.*, *Webb v. Hamidullah*, 281 F. App'x 159, 166–67 (4th Cir. 2008) (affirming summary judgment for defendant physician where he prescribed surgery for plaintiff's hernia, but only on an elective basis, despite plaintiff's continued complaints of pain during the time between ordering the surgery and the time the surgery was held, and concluding that the years-long delay in surgery did not constitute an Eighth Amendment violation

even though the physician had initially stated it should occur within six months); *Martin v. Bowman*, 48 F.3d 1216, 1994 WL 82444, at *4–5 (4th Cir. 1995) (affirming grant of summary judgment for medical staff who refused to approve knee surgery for two pretrial detainees where physicians had examined both plaintiffs but had concluded that the surgery was not needed on an emergency basis).

The next time White complained about his foot was in January 2020. He was seen by a different physician, who ordered excision, although Dr. Smith was not informed of that order. But during a sick-call appointment in March 2020, Dr. Smith first noticed a change in the lesion's appearance. At that time, Dr. Smith immediately ordered excision, performed that excision within a week, and subsequently referred Hall to an outside dermatologist to ensure that there was no cancer at the edges of the spot.

Nothing about Dr. Smith's actions suggest he was deliberately indifferent. Instead, Dr. Smith provided timely examinations each time White complained, and he provided treatment consistent with his reasoned medical judgment. And White's personal opinion that he should have had the excision earlier, standing alone, does not create a genuine issue of material fact on this issue. In Dr. Smith's medical judgment, the excision was an elective procedure and not medically required until he noticed changes to the spot in March 2020. At that point, the problem was handled with due haste. Dr. Smith performed an excision within a week, and White had his surgery with Dr. Savola within a month after that. And the final diagnosis confirms that the lesion was not cancerous. The record thus reflects that Dr. Smith provided timely and responsive medical treatment to White.[12] Because the evidence does not support a finding that Dr. Smith

---

[12] Even if the court were to conclude that Dr. Smith was somehow negligent for not learning about Dr. Cutchin's

knew of a serious medical need and ignored it or failed to treat it in a timely fashion, White cannot show deliberate indifference.

The facts of this case are thus materially different from those at issue in *Gordon v. Schilling*, 937 F.3d 348, 357–58 (4th Cir. 2019), where there was evidence that one of the defendants was aware that the plaintiff had hepatitis C, was not being treated for it, and was aware that a lack of treatment for someone with the plaintiff's diagnosis could create a substantial risk of harm. Based on those facts, the court in *Gordon* reasoned that a factfinder could find deliberate indifference. *Id.*; *see also Scinto v. Stansberry*, 841 F.3d 219, 228-29 (4th Cir. 2019) (concluding that a deprivation of prescribed insulin could violate the Eighth Amendment where the defendant physician had been the prescriber and therefore recognized the need for the insulin). Here, by contrast, there is no evidence that Dr. Smith was aware that failing to provide additional treatment could result in a risk of substantial harm to White. The undisputed medical evidence reflects that he (like Dr. Mann before him) had examined White and concluded that the spot on his foot was not malignant and posed no risk if left untreated, at least until January 2020. *Cf. Scinto*, 841 F.3d at 227–28 (holding that a jury could find a physician had violated the Eighth Amendment where he failed to provide the plaintiff with insulin when needed on one occasion and where, under that particular physician's care, the plaintiff experienced increases in his blood sugar and A1C values, and noting that there was evidence that the physician knew of plaintiff's medical need for insulin and failed to respond to that known need).

---

January 2020 order of excision—and, as noted, there is no evidence in the record as to why Dr. Smith did not know that information—White still cannot meet the high burden of showing deliberate indifference. With that additional delay considered, White complained in January 2020 (to the other physician), and received an excision by Dr. Smith two months later. That is not an inordinate delay in providing care in this context and for this particular issue.

And to the extent that White contends that Dr. Smith violated his Eighth Amendment rights by mistakenly characterizing the surgery as elective—an argument which is unsupported by any expert testimony—that medical judgment does not support an Eighth Amendment claim under clear Fourth Circuit precedent. In *Jackson*, the Fourth Circuit affirmed the district court's grant of summary judgment for a physician who, although not a heart specialist, diagnosed plaintiff with a less serious condition, despite the plaintiff's producing (or offering to produce) medical records showing a cardiologist had diagnosed and treated him for a more serious condition. 775 F.3d at 178. The defendant physician also "substantially modified the medication regimen" prescribed by the cardiologist. *Id.* Although the court noted that those treatment decisions "may have been mistaken, even gravely so," they fell "short of showing deliberate indifference. *Id.*

With regard to the antibiotics, Dr. Savola's orders did not reach ACC until days after White had the surgery. It is therefore inaccurate to claim that Dr. Smith failed to follow Dr. Savola's recommendations. Moreover, and despite not having an order from Dr. Savola for an antibiotic, Dr. Smith took it upon himself to prescribe one. That antibiotic initially appeared to be successful, but when it later appeared that there might be an infection, Dr. Smith tried two other antibiotics, increasing the dose of one after the first time.

It is unfortunate that the antibiotic prescribed by Dr. Smith did not prevent infection and that it took several different medications to finally cure White's infection. But the fact that a more favorable outcome does not result from medical treatment does not give rise to a constitutional violation. *Jackson*, 775 F.3d at 178–79 (explaining that neither medical negligence nor a disagreement between an inmate and a medical provider over the proper medical care is sufficient

to show deliberate indifference for constitutional purposes); *see also Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985) (holding that plaintiff's claim that the medical treatment he received was unsuccessful was not sufficient to establish an Eighth Amendment violation); *Odom v. S.C.D.C. Transp. FNU LNU*, No. 3:06-3417-PMD-JRM, 2007 WL 3034889, at *4 (D.S.C. Oct. 15, 2007) (explaining that the "allegedly ineffective" medical care the plaintiff received, "while unfortunate, does not raise an issue of constitutional proportions"). This principle is particularly apt in this case, where the undisputed record reflects that, after White's outside surgery on April 21, 2020, Dr. Smith closely monitored White's progress. Indeed, Dr. Smith either examined or prescribed medicine or gave other instructions for White nine times from the day of surgery until May 9, a period of less than three weeks. No reasonable jury could conclude that such diligent care provided after the surgery was "so grossly incompetent" that it would support an Eighth Amendment claim. *Cf. Miltier*, 896 F.2d at 851.

White insists that a five-day course of antibiotics was required, and alleges that Dr. Smith prescribed a five-day course after the first excision that Dr. Smith performed. But White presents nothing—and certainly no medical evidence—to support a finding that Dr. Smith's conduct and medical decision to use a one-day course of antibiotics instead was either unreasonable or "grossly incompetent."

In summary, based on the evidence presented, no reasonable jury could find that Dr. Smith knew of or disregarded an excessive risk to White's health or safety. *See Jackson*, 775 F.3d at 178. Although White may disagree with the treatment decisions made by Dr. Smith, "such disagreements . . . fall short of showing deliberate indifference." *Jackson*, 775 F.3d at 178. Accordingly, the court concludes that Dr. Smith is entitled to summary judgment.

## V.   Conclusion

In sum, the communication lapses among White's medical providers and the protracted elective-surgery scheduling process are concerning. But the Constitution does not require best medical practices, and the Eighth Amendment is not violated by negligence alone. On the facts here, and for the reasons discussed above, the court concludes that no reasonable factfinder could find that Dameron or Dr. Smith violated White's Eighth Amendment rights by being deliberately indifferent to a serious medical need. Accordingly, the court will grant the motions for summary judgment filed by them. To the extent White's complaint could be construed as asserting any state-law claims against these defendants, the court will decline to exercise supplemental jurisdiction over any such claims. *See* 28 U.S.C. § 1367(c).

The clerk is directed to forward a copy of this Memorandum Opinion to the parties.

**ENTERED** this 4th day of January, 2022.

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE